UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

SUSAN A. HENNEMAN,

                Plaintiff,

        v.                            Case No. 06-C-0368

AIRTRAN AIRWAYS, a
wholly owned subsidiary of
AIRTRAN HOLDINGS, INC.,

                Defendant.

## DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. # 19), AND DISMISSING CASE

        Plaintiff, Susan Henneman, was employed by defendant AirTran Airways between May 31, 2002, and January 26, 2004. She alleges that during her employment she was subjected to sex discrimination in the form of a hostile work environment, and unlawful retaliation. (*See* Compl. ¶¶ 44-49.) She brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Before the court is AirTran's motion for summary judgment on all claims.

## SUMMARY JUDGMENT STANDARD

        Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## BACKGROUND[1]

---

[1] Five related cases, including this one, were brought by former AirTran employees against AirTran—*Dalton v. Airtran Airways*, Case No. 06-CV-348 (E.D. Wis); *Jensen v. AirTran Airways,* Case No. 06—CV-350 (E.D. Wis.); *Henneman v. AirTran Airways*, Case No. 06-CV-368 (E.D. Wis.); *Ott v. AirTran Airways*, Case No. 06-CV-371 (E.D. Wis.); *Cain v. AirTran Airways*, Case No. 06-CV-489 (E.D. Wis.). While these cases have not been consolidated, the defendants moved for summary judgment in all cases, and the parties consolidated briefing for all summary judgment motions. This resulted in nearly 1300 proposed findings of fact submitted by the parties (293 for the defendants, 1096 by the plaintiffs), along with more than one thousand pages of response materials and supporting documents. And, while the parties have submitted a very limited set of stipulated facts, most of their proposed findings of fact are disputed. Navigation of the record has therefore been a substantial and time-consuming endeavor.

With that in mind, the court has relied on the parties' set of stipulated facts, as well as each side's proposed findings of fact to the extent that they are undisputed, or that any alleged dispute is immaterial, unsupported, or otherwise not compliant with the local rules. Stipulated proposed findings of fact are designated as "SPFOF"; defendant's proposed findings of fact are identified as "DPFOF"; and plaintiff's proposed findings of fact are identified as "PPFOF."

Further, though AirTran has submitted evidence and proposed findings of fact disputing most of Henneman's allegations, the background section is crafted assuming Henneman's version of events for the purposes of summary judgment.

2

AirTran is a low-fare commercial airline that has operated out of Milwaukee since June 2002. It has corporate offices in Orlando, Florida and Atlanta, Georgia. The Milwaukee station operates with about twenty-five employees. This includes a station manager, which is the top spot, followed by two or three station supervisors. All other employees carry the title of customer service agent.

Susan Henneman was a customer service agent for AirTran in Milwaukee between May 31, 2002, and January 26, 2004. Henneman's fellow customer service agents included James Lipsey, who worked for AirTran from July 2002 to April 28, 2005; Larry Moore, who worked for AirTran from July 2002 to August 28, 2003; and Wes Davis, who worked for AirTran starting in February 2003. In addition, Laurie Dalton, Victoria Jensen, Tami Ott, and Latrina Cain (who are all plaintiffs in related actions against AirTran) were employed by AirTran in Milwaukee as customer service agents.

Terese Sellers was the station manager for AirTran between March 6, 1999, and February 4, 2005. David Fox, who had served as a station supervisor between July 2002 and January 2006, became the station manager in January 2006. Tom Cross was a station supervisor for AirTran from May 31, 2002 to October 13, 2006. Thomas O'Neil has been employed by AirTran since May 31, 2002, and between June 16, 2003 and August 1, 2004, he carried the title of station supervisor. Amy Morris was employed by AirTran between June 2002 and August 2005 as its manager of employee relations and diversity. In this capacity, Morris oversaw AirTran's investigations into discrimination complaints. She operated out of AirTran's office in Atlanta, Georgia.

Decisions regarding hiring, promotions, transfers, layoffs, recalls, discipline, scheduling, and discharge of customer service agents are made by the station manager

3

in Milwaukee or a human resources officer at AirTran's corporate headquarters. Station supervisors may assign personnel to various tasks and may issue Employee Discipline Reports and Attendance Review Forms reflecting absences or tardiness. For the most part, station supervisors perform their tasks alongside customer service agents.

Customer service agents perform various duties, including issuing tickets and boarding passes; checking baggage; assisting passengers boarding and exiting aircraft; loading and unloading bags at the ticket counter, gate, and aircraft; cleaning aircraft; security; marshaling aircraft; and otherwise providing service to customers. (DPFOF ¶ 12.[2]) These duties are performed at three principle areas: the passenger ticket counter; the flight gate; and the flight tarmac (also referred to as "ramp" duties). (DPFOF ¶ 23.) All customer service agents are trained to work in these three areas because staffing levels necessitate that each employee be prepared to work in any area during a given week, and shift from one area to another during a given day. (DPFOF ¶ 25.[3])

Some of the tasks associated with the customer service position involve heavy lifting and general physical labor. The job description for a customer service agent includes, among other things, the ability to work indoors and outdoors with strength and

---

[2] Of note, many of the plaintiff's responses to the defendant's proposed findings of fact do not comply with Civil Local Rule 56.2(b)(1) (in effect prior to February 1, 2010). That Rule provides that materials in opposition to a summary judgment motion must include "A specific response to the movant's proposed findings of fact, clearly delineating only those findings to which it is asserted that a genuine issue of material fact exists. The response must refer to the contested finding by paragraph number and must include specific citations to evidentiary materials in the record which support the claim that a dispute exists." Often, the court is left to wonder what aspects of a proposed finding of fact are actually disputed, why they are disputed, and what evidence specifically calls the proposed fact into dispute. Without proper objections, such proposed findings may be deemed admitted for purposes of the summary judgment motion.

[3] The plaintiff "denies" this proposed fact, but (1) she does submit a proper objection pursuant to Civil L.R. 56.2(b)(1), and (2) the proposed findings of fact that she cites in support of her "denial" (or the evidence supporting the proposed facts) do not speak to this point. (*See* Pl.'s Resp. to DPFOF ¶ 25.)

4

stamina to endure standing for an entire shift, as well as the ability to lift and move items up to seventy pounds repetitively, and climb, bend, kneel, crawl, and stoop on a frequent basis. (Fox Decl. ¶¶ 24-26, Def.'s Ex. 8.) This is particularly true on the ramp, though agents working at the counter or the gate often have to move or assist with luggage. (DPFOF ¶ 29.) Agents wear different uniforms depending on whether they are working the ramp or the ticket counter, and may be required to change clothes so as to assist in another area during a shift. (*See id.* ¶ 27.)

In addition, at certain times, AirTran assigned personnel to the "operations center," where agents perform administrative tasks related to incoming and outgoing flights. AirTran also assigned personnel to "baggage services," where agents work in the baggage claim area and in AirTran's lost baggage office. (SPFOF ¶¶ 32-35.) Further, agents were regularly assigned to an area known as the "bag room," which is part of the "ramp" assignment. In the bag room, agents load bags from the ticket counter conveyor belt onto carts for transport to the tarmac, and help load and unload bags relative to aircraft and the baggage claim carousel. (DPFOF ¶ 31.) As opposed to the tarmac, the bag room is protected from the elements and heated in the winter and cooled in the summer. Agents in the bag room routinely interact with agents on the ramp and the ticket counter. (*Id.* ¶¶ 31-32.)

Occasionally, certain agents were assigned only to the ticket counter or gate (as opposed to the ramp) for short periods while recovering from injury. (DPFOF ¶¶ 46-48; PPFOF ¶¶ 63, 73.) Agents understood this to be "light duty," though AirTran had no official "light duty" assignment. (*See* PPFOF ¶ 57; DPFOF ¶ 44.) Instead, AirTran's policy was to work with agents to assess whether modified duty may be available to an agent

5

recovering from an on-the-job injury, though such modified duty is not guaranteed and varies from case to case. (DPFOF ¶ 11.) In early 2003, AirTran station managers were informed that extensive modified duty assignments were affecting the efficiency of the airline's operations, and the Milwaukee station thereafter limited light duty assignments. (*Id.* ¶ 49-50.)

AirTran maintained written employment policies in its Crew Member Handbook, which was updated periodically. (*See* Def's. Ex. 1.) The Handbook included written policies regarding equal employment opportunities and sexual harassment. During the relevant time period, the Handbook read, in part:

### Equal Employment Opportunity

AirTran Airways is committed to providing equal employment opportunities to all qualified Crew Members and applicants for employment without regard to race, color, religion, sex, national origin, age, disability, marital status, or status as a Vietnam-era or special disabled veteran in accordance with applicable federal laws. In addition, AirTran Airways complies with applicable state and local laws governing nondiscrimination in employment in every location, which AirTran Airways has facilities. This policy applies to all terms and conditions of employment, including but not limited to recruiting, hiring, promotion, termination, lay-off, recall, transfer, leaves, compensation, benefits, and training.

### Policy Against Harassment

AirTran Airways is committed to providing a respectful and caring work environment. As such, AirTran Airways does not condone or tolerate any form of harassment, including sexual harassment. It is the responsibility of every officer, manager, supervisor, and Crew Member to maintain a work environment free of harassment. Harassment related to race, color, religion, sex, national origin, age, disability, marital status, or status as a Vietnam-era or special disabled veteran is prohibited and will be grounds for disciplinary action up to and including termination.

Harassment is defined as
a) Any conduct or language directed toward another Crew Member that is unwelcome or is offensive based upon the individual's race, color, religion, sex, national origin, age, disability, marital status, or status as a Vietnam-era or special disabled veteran, or
b) Conduct that has the effect or purpose of unreasonably interfering with an individual's work performance

6

or creating an uncomfortable, intimidating, hostile or offensive working environment, or

Prohibited harassment includes:

     1. Epithets, slurs, negative stereotyping or threatening, intimidating, or hostile acts that relate to race, color, religion, sex, national origin, age, disability, marital status, or status as a Vietnam-era or special disabled veteran.

     2. Written graphic material that denigrates or shows hostility or aversion toward an individual or group because of race, color, religion, sex, national origin, age, disability, marital status, or status as a Vietnam-era or special disabled veteran that is placed on the Crew Member's personal property, walls, bulletin boards or elsewhere on AirTran Airway's premises, circulated or otherwise made visible in the workplace.

     3. An unwelcome sexual advance, a request for sexual favors, and/or other verbal or physical conduct of a sexual nature constitute harassment when:

          a) Submission to such conduct is made, either explicitly or implicitly, a term or condition of an individual's employment, or

          b) Submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting such individual, or

          c) Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment

     4. Activities that are not condoned by AirTran Airways and may contribute to an illegal hostile environment including [sic] discussing sexual activities, jokes of a sexual nature or use of unnecessary sexual innuendo or connotations, unnecessary touching, using inappropriate terms or gestures, using crude or offensive language.

Harassment does not refer to occasional compliments of a socially acceptable nature. It refers to behavior, which is not welcome, which is personally offensive, and which therefore interferes with work effectiveness. All Crew Members are expected to comply with both the letter and the spirit of this policy. If in doubt, consult your manager or the Human Resources Department.

### *Reporting and Investigating Harassment*

Any Crew Member who believes that a manager, supervisor, coworker, customer, or vendor is harassing him or her, sexually or otherwise, is directed to promptly take the following steps:

     1. Politely, but firmly, confront the person who is harassing. State how you feel about specific actions, Politely request that

7

the person stop the unwanted behavior because you feel offended, uncomfortable, or intimidated. If practical, bring a witness with you for this discussion.

2. If the harassment continues, or if you believe some harm may result from speaking directly to the individual, contact your supervisor or manager. State the problem, either verbally or in writing.

3. Keep notes. Write down what happened, indicate the date, summarize your conversation with the person you believe is harassing you and explain the person's reaction during your confrontation. If you are unable to reach your supervisor/manager, if your complaint involves the supervisor or manager, or if you are unable to solve your problem by talking with your supervisor/manager, take your complaint to the next level of supervision or to the Human Resources Department.

4. If the problem is still unresolved or if you fear retaliation, contact the Human Resources Department. All complaints will be treated in as confidential a manner as possible, consistent with a full investigation.

5. If the investigation reveals that it is appropriate, disciplinary action designed to stop the harassment immediately and to prevent its recurrence will be taken.

AirTran Airways expressly prohibits retaliation against any person filing a complaint of harassment or against any person participating in an investigation.

Supervisors or managers who knowingly allow or tolerate harassment, sexual or otherwise, are in violation of this policy and will be subject to appropriate disciplinary actions.

AirTran Airways recognizes that false accusations of harassment can have serious effects on innocent individuals. As such, we will approach each complaint investigation with the interest of all Crew Members in mind. We trust that all Crew Members will act responsibly in reporting harassment.

(Def.'s Ex. 1 at 78-80; DPFOF ¶ 4-7.)[4]  For the most part, all new AirTran employees receive a copy of the then-current Handbook during their initial company training in Atlanta.

This was true for Henneman, Dalton, Jensen, and Cain. (SPFOF ¶ 26.) Updated versions

---

[4] The Handbook was updated periodically, and an important addition to the above language was made to the October 2002 version. That change added contact language to subparagraph "4" of the "Reporting and Investigating Harassment" section: "You should request to speak to the Manager of Crew Member Relations at 1-800- 965-2107 ext. 6202 or the Vice President of Human Resources at ext. 3641." (DPFOF ¶ 7.)

8

of the Handbook are mailed to each station and distributed to the employees. (DPFOF ¶ 17.) In addition, electronic versions of the Handbook are available online through the company's intranet service, and the company's anti-harassment policies were posted throughout the employee break areas and behind the ticket counter. (DPFOF ¶¶ 18-19.) Henneman, along with Dalton, Jensen, and Ott, received training by AirTran on the subject of sexual harassment in the workplace.

Despite AirTran's anti-harassment policy and training programs, Henneman contends that dozens of incidents occurred during the course of her employment that contributed to a sexually hostile work environment. The primary offenders, according to Henneman, include station manager Terese Sellers, station supervisors Tom Cross and Thomas O'Neil, and customer service agents James Lipsey, Sal Bercerra, and Larry Moore.

Henneman points to the following events involving Tom Cross in support of her claims. In July 2002, Henneman witnessed Cross comment to Sellers "in a very immature voice . . . 'please, Terry, please. Come on do it, do it.'" Sellers later explained to Henneman that Cross was implying that he wanted to have sex with her. (Pl.'s Ex. 3 at 29-30.) According to Henneman, Sellers thought this was "cute." (*Id.* at 30.) In the summer of 2002, Henneman overheard Cross comment to Sellers that she "was the right height" for him, which Henneman believed to be a reference to oral sex. (*Id.* at 80.) Also during the summer of 2002, Henneman overheard Cross talk about how he and his friends wanted to get a bus, provide alcohol on the bus, and invite flight attendants along with the hope of having "gang-banging sex all the way home." (*Id.* at 38.)

9

One day in the summer of 2003, Henneman observed Cross put his fingers in the air, demonstrating a sexual act he likes to perform on women. (*Id.* at 80-81). At some point, Henneman also overheard Cross say that he wanted to hire an applicant because she was wearing thong underwear and he "wanted to get a piece of that." (*Id.* at 84. ) And, on more than one occasion, Henneman overheard Cross refer to another female customer service agent as "the AirTran whore." (*Id.* at 83.) Once, she observed Cross ask customer service agent Latrina Cain if he could see her breasts. (*Id.* at 84, 93.) In October 2003, Henneman informed Sellers that she believed that Cain may quit because of the way Cross was treating her. (*Id.* at 94-95.) Henneman did not provide any details to Sellers about why Cain may quit, just that she believed employees were quitting because of Cross and that Cross "needed to be stopped." (*Id.* at 99.) At Sellers request, Henneman spoke to Cross and stated that she knew he wanted to be a pilot and that because of his inappropriate behavior some of the female employees may file suit. She said it would be a shame if he were to ruin his plan of becoming a pilot due to his behavior and comments. (*Id.* at 100-01.)

With regard to Terese Sellers, Henneman asserts that in July 2002, while they were outside smoking a cigarette, Sellers commented to Henneman that she was promoting Tom Cross to supervisor. In this conversation, Sellers stated to Henneman "You know, its funny who you end up sleeping with in this business," which Henneman believed to mean that at some point Sellers may have had sex with Cross. (*Id.* at 31-32, 35.) At some point during the summer of 2002, Sellers mentioned to Henneman that she found out that Lipsey and Moore made a bet during training in Atlanta about who would be the first to have sex with customer service agents Laurie Dalton and Victoria Jensen. (*Id.* at

10

37; PPFOF ¶ 539.)  In the early spring of 2003, Sellers asked Henneman to help her wipe down her office with disinfectant because she believed Moore had sex with a "TSA girl" in the office.  (Pl.'s Ex. 3 at 65.)

With regard to station supervisor Thomas O'Neil, Henneman states that when she, along with agents Dalton and Deanna Bublitz, worked at the ticket counter, O'Neil would pass behind them, in the area between the ticket counter and the bag belt directly behind the counter, and rub up against them.  This conduct started in the fall of 2003 and continued during her employment.  (*Id.* at 46-47.)  According to Henneman, a "normal person walking behind the ticket counter would be walking straight ahead" but that O'Neil "would proceed to turn his body toward ours."  (*Id.* at 42.)  The physical contact would occur only as long as it took for O'Neil to brush by, and he never made any comments or engaged in any other activity that Henneman thought to be sexually inappropriate.  (*Id.* at 47.)  Henneman testified that the first few times O'Neil would brush up against the women, she "didn't really give it a second thought.  But it kept occurring."  Henneman did not mention O'Neil's brush-bys to anyone at AirTran, aside from the conversations that Henneman had with Dalton and Bublitz.

Several incidents of alleged sexual harassment involve Henneman's fellow customer service agents.  Henneman states in October or December 2002, she observed agents Larry Moore, James Lipsey, Wes Davis, and Sal Bercerra viewing pornography on computers at the Milwaukee station.  (*Id.* at 129.)  In addition, Moore used Henneman's online account to access pornographic and sex-chat websites.  (*Id.* at 131-32.) Henneman complained to Sellers about Moore using her online account, and Sellers called Moore into

11

her office. Henneman then told Moore to clear her account within 24 hours, which Moore did. (*Id.* at 135-136.)

Henneman also contends that Bercerra had a sticker on his locker that included the word "pimp," but Henneman cannot recall what else was on the sticker. (*Id.* at 48.) She never discussed the sticker with Bercerra or others at AirTran. (*Id.* at 49.) At one point before June 2003, Henneman heard Bercerra comment "pimp daddy and his ho's needed to get over to the ramp." (*Id.* at 49-51.) With regard to this comment, Henneman "brushed it off." (*Id.* at 66.) Henneman never complained to management about Bercerra. (*Id.* at 51)

Henneman also testified that her male coworkers often made sexually inappropriate comments. (*Id.* at 41.) For instance, Henneman testified that she overheard Moore make comments about how he "really had no problems getting women and having sex with women and that he felt men were above women." (*Id.* at 51-53.) According to Henneman, Lipsey would join in inappropriate conversations with Moore and "they would play off each other." (*Id.* at 67.) Henneman complained to Sellers sometime before June 2003 that she believed Moore's comments were inappropriate for the workplace. (*Id.* at 62-63). According to Henneman, Sellers responded with "boys will be boys." (*Id.* at 64.)

Henneman states that she was physically assaulted by Lipsey on April 20, 2003.[5] That day, Henneman was working in the ramp area and helping to load and unload bags from an airplane. (*Id.* at 141-43.) Lipsey, Moore, and agent Adam Garringer were also loading and unloading bags. (*Id.* at 141.) Lipsey started commenting to Henneman

---

[5] April 20, 2003 happened to be Easter Sunday, a fact which is occasionally noted in the parties' summary judgment materials.

12

that she was "way too pretty to be working on this ramp" and Henneman replied that that

was "a nice thing to say." Lipsey then said that they "could have a booty call relationship"

and he would like to "experience her." (*Id.* at 143-44.) Henneman replied "You know

James, I would really be way too much for you to handle." (*Id.* at 144.) Henneman, Lipsey,

and Moore, continued to load bags, when, according to Henneman, Lipsey

> grabbed my arms and spread them apart . . . . And he leaned
> into me, and I could feel his penis poking into by buttocks, and
> he asked me how it felt. And he asked if I had ever been with
> a black man. And he told me again that he really wanted to
> experience being with me and that he thought it was a good
> idea that him and Larry pull me into the bin right now and take
> care of business.

(*Id.* at 145.) Henneman then yelled for Garringer. Hearing this, Moore "put his hands up

and backed away and said he didn't want anything to do with this and went way back into

the bin so he couldn't see anything further." (*Id.* at 145-46.) Lipsey then let Henneman go.

(*Id.* at 146.) After this incident, Henneman was so shaken that she went to the restroom

to pull herself together. Thereafter, she told Garringer that she needed to leave early. (*Id.*

at 146-47.)

Henneman reported this incident to Sellers on April 23, 2003. (*Id.* at 155.)

Sellers then gave Henneman a form to fill out regarding allegations of sexual harassment.

(SPFOF ¶ 189.) Amy Morris was notified of the complaint and conducted an internal

investigation. She reviewed Henneman's written statement, as well as statements

provided by Lipsey and Moore. (SPFOF ¶¶ 189-90.) On June 2, 2003, Morris sent a letter

to Henneman stating that the investigation was closed:

> [T]he Human Resources department has closed the
> investigation into your complaint against Mr. James Lipsey.
> Please be advised that we could not substantiate your
> allegations, partly due to the fact that confidentiality was

13

> compromised prior to the start of the investigation. However, we have nevertheless taken the appropriate steps to ensure that this type of incident will not occur again.

(Def.'s Ex. 147.) Morris also sent a letter to Lipsey stating that the investigation was closed, and that "further allegations of sexual harassment against him would not be tolerated." (SPFOF ¶ 191.) A copy of AirTran's sexual harassment policy was provided with the letter. (*Id.*)

A few months later, during the summer of 2003, Henneman observed Moore yell at Dalton that she should quit because she was ruining his life. (*Id.* at 56.) Around this same time, in June or July 2003, Moore starting whispering offensive and threatening comments to Henneman. (*Id.* at 171.) According to Henneman,

> They were just little words in passing. They started with things like 'You'd better watch out,' 'Don't let me stand behind you.' They grew more bold as to 'Are your children out for school yet.' Or 'Are they home alone.' 'You shouldn't worry about me when I'm here. Its when I'm not here you should be worried.'

(*Id.* at 175.) Henneman met twice with Fox, Cross, and O'Neil—on July 19, 2003 and July 26, 2003—and complained about Moore's threats. (*Id.*) Dalton was in one of the meetings and recalls that Moore yelled at Henneman and threatened her. (Pl.'s Ex. 1 v. III at 289;[6] *see also* Pl.'s Ex. 3 at 174.) Fox reported Henneman's complaints to Sellers. (Pl.'s Ex. 7 at 108-09.) Sellers then met with Henneman and Henneman indicated that she wanted to file a report with the sheriff's department. Sellers encouraged her to do so. (*Id.* at 111.) On July 26, 2003, Henneman filed a complaint against Lipsey and Moore with the

---

[6] While Dalton's deposition testimony indicates that Moore was belligerent and threatening toward Henneman in this meeting, (Pl.'s Ex. 1 v.III at 289-90), Henneman does not mention any of this in her testimony, (Pl.'s Ex. 3 at 174-75).

14

Milwaukee County Sheriff's Department alleging that they had sexually harassed her and had made threats towards her and her children. (SPFOF ¶ 167.)

Henneman's career at AirTran ended when she injured her left shoulder on January 26, 2004. As a result of the injury, she was issued medical restrictions on lifting, pushing, and pulling, and the use of her left arm. Between February 4, 2004, and April 9, 2004, Henneman's medical restrictions required that she not work. (*Id.* ¶ 171-72.) On April 9, 2004, Henneman was released to work with medical restrictions that precluded her from lifting in excess of twenty pounds and from lifting items above her shoulder with her left arm. (*Id.* ¶ 175-77.) She had surgery on her shoulder in June 2004 to address the injury.

At various points between April 9, 2004, and December 20, 2004, Henneman made multiple requests to AirTran that she be permitted to work a "light duty" schedule. These requests were denied because, according to AirTran, it was not able to accommodate her medical restrictions.

Henneman filed her first administrative charge of sex discrimination and retaliation with the Wisconsin Department of Workforce Development, Equal Rights Division (ERD), on August 10, 2004, and cross-filed with the Equal Employment Opportunity Commission (EEOC). (SPFOF ¶ 44.)

On December 20, 2004, Henneman's physician determined that her medical restrictions were permanent. Thereafter, Henneman again requested a "light duty" assignment by which she would be scheduled "mainly ticket counter and gate with one day of ramp, scheduled with all men for the ramp shift and the ability to be moved to the ticket counter if the ramp was light." (SPFOF ¶ 178.) In January 2005, Henneman met with Amy Morris and Cheryl Beasley, AirTran's Manager of Corporate Health and Safety, to discuss

15

whether she could perform the duties of a customer service agent given that her medical restrictions were now permanent. (Def.'s Ex. 111.[7]) AirTran again concluded after considering Henneman's permanent restrictions, it could not accommodate her as a customer service agent and offered her other employment options.

On October 26, 2005, Henneman filed a second administrative charge of discrimination with the ERD and EEOC alleging additional incidents of retaliation. (Def.'s Ex. 12.) She thereafter initiated this action.

## DISCUSSION

Title VII forbids workplace discrimination against an employee "with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), and discrimination against an employee for opposing a practice otherwise made unlawful under Title VII, 42 U.S.C. § 2000e-3(a). Discrimination under Title VII includes sexual harassment in the workplace, *Phelan v. Cook County*, 463 F.3d 773, 782-83 (7th Cir. 2006), and retaliation against an employee because the employee has complained of illegal discrimination, *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007).

### A. Hostile Work Environment

As an initial matter, Henneman first asserts that she was subject to a hostile work environment based on sexual harassment. To succeed on this claim, a plaintiff must show that (1) she was subjected to unwelcome harassment, (2) the harassment was based on her sex, (3) the harassment was sufficiently severe or pervasive so as to alter the

---

[7] The parties' stipulated proposed findings of fact indicate that AirTran requested a meeting with Henneman in January 2004. (SPFOF ¶ 179-180.) However, the record indicates that this occurred in January 2005. (Def.'s Ex. 111, 112.)

16

conditions of her employment and create a hostile or abusive atmosphere, and (4) there is a basis for employer liability. *Kampmier*, 472 F.3d at 940. Here, AirTran does not challenge Henneman's claim regarding the first and second factors of the prima facie case. Instead, it contends that Henneman cannot establish that (1) the alleged harassment was sufficiently severe or pervasive to create a hostile or abusive atmosphere, and (2) there is a basis for employer liability.

### 1. Hostile or Abusive Atmosphere

"In order to survive summary judgment on a hostile work environment claim, a plaintiff must present evidence that would establish that the allegedly hostile conduct was so severe or pervasive as to create an abusive working environment in violation of Title VII." *Robinson v. Sappington*, 351 F.3d 317, 329 (7th Cir. 2004) (quoting *Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 243 F.3d 336 (7th Cir. 2001)). To do so, she must show that it "was both objectively and subjectively offensive." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004). As to objective hostility, "[c]ourts look to several factors . . . including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance." *Kampmier*, 472 F.3d at 941 (citing *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806-07 (7th Cir. 2000)). "In other words, the environment must be 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002)).

"[T]he line between actionable and nonactionable sexual harassment 'is not always easy' . . ."; it is not governed by a "mathematically precise test." *Robinson*, 351

17

F.3d at 329. "The 'occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers generally does not create a work environment that a reasonable person would find intolerable." *Id.* (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)). However, when the offensive conduct is proved to be so severe, even isolated incidents may potentially create a hostile work environment for the employee. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002.)

For its part, AirTran does not dispute that Henneman and others testified to the incidents and actions described above. Instead, it maintains that the key allegations of harassment cited by Henneman are not actionable because they fall outside the applicable limitations period.

Under Title VII, a plaintiff in Wisconsin must file an employment discrimination charge with the EEOC within 300 days after the alleged unlawful employment practice occurred. *See* 42 U.S.C. § 2000e-5 (e)(1). A hostile work environment qualifies as an unlawful employment practice, see *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383 (7th Cir. 2007), and "[a] charge of discrimination based on a hostile work environment covers all events during that hostile environment, if the charge is filed within 300 days . . . of the last act said to constitute the discriminatory working condition." *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 768 (7th Cir. 2007); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104-05 (2002).

Where a plaintiff can establish that "an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Morgan*, 536 U.S. at 117. The Supreme Court adopted this "continuing violation" approach

18

because "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 117.

Here, Henneman filed her first administrative charge with the ERD and EEOC on August 10, 2004. (SPFOF ¶ 44.) Under 42 U.S.C. § 2000e-5(e)(1), the 300-day window reaches back to October 13, 2003. Thus, the parties agree that to be timely, Henneman's hostile work environment claim must, in part, be based on incidents that occurred on or after October 13, 2003.

According to AirTran, all of the key incidents of alleged harassment by Henneman's fellow customer service agents (including Lipsey, Moore, and Bercerra) occurred prior to October 13, 2003, and that post-October 13, 2003, allegations concerning O'Neil and Cross should be considered separately. In response, Henneman concedes that nearly all of the instances of harassment occurred outside the limitations period; however, she contends that her claim can go forward because (1) O'Neil "frequently rubbed his pelvis against Ms. Henneman's backside . . . from the fall of 2003 through the remainder of her employment," and (2) she was "expos[ed] to demeaning, degrading comments . . . after the statutory deadline." (Pl.'s Br. in Opp. 44.) Apparently, the latter includes Henneman overhearing Cross refer to another customer service agent as "the AirTran whore," and Henneman's observation of Cross in October 2003 asking Cain if he could see her breasts. (Pl.'s Br. 44-45.) Also, Henneman contends that she complained to Sellers within the limitations period about Cross's behavior, and "cautioned Cross about the consequences of his sexually harassing behavior." (*Id.*)

Under *Morgan*, the court's charge is to look at all the circumstances, *Morgan*, 536 U.S. at 116. "It is inappropriate to draw lines by time . . . or by the particular method

19

that the men used to make working conditions worse for the women than for themselves,"
*Bright*, 510 F.3d at 769-70. "Title VII creates responsibilities for 'employers' as entities."
*Bright*, 510 F.3d at 768; *see also Isaacs*, 485 F.3d at 386 (noting that the court should not
focus on the identities of the alleged harassers—the defendant is the employer, the entity
responsible for complying with Title VII). "If a plaintiff claims that [s]he is suffering a hostile
work environment based on the conduct of coworkers and supervisors, then under the
Supreme Court's totality of circumstances approach . . . all instances of harassment by all
parties are relevant to proving that h[er] environment is sufficiently severe or pervasive."
*Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1045 (7th Cir. 2000) (internal citations
omitted). While the question of employer liability requires the court to separate conduct
of a supervisor from conduct of coworkers, *see Parkins v. Civil Constructors of Ill., Inc*., 163
F.3d 1027, 1032 (7th Cir. 1998), "[c]ourts should not carve up the incidents of harassment
and then separately analyze each incident, by itself, to see if each rises to the level of
being severe or pervasive," *Mason*, 233 F.3d at 1045. Thus, in evaluating whether
Henneman's work environment was sexually hostile, the court should not separate Cross's
behavior from that of Lipsey, Moore, and others in the absence of a significant temporal
gap or other event demonstrating the incidents must be considered separately.

   With this backdrop, inasmuch as Henneman has alleged that certain
incidents were ongoing through January 2004 and perpetrated by the same individuals, all
incidents of alleged harassment may be considered. *See Morgan*, 536 U.S. at 120
(affirming court of appeals finding the pre- and post-limitations period incidents may be
considered as they involved the same types of actions, the same persons, and occurred
relatively frequently). And, while the majority of Henneman's allegations consist of

comments and conduct not directed at her, *see Yuknis v. First Student, Inc.*, 481 F.3d 552 (7th Cir. 2007) (discussing targeted harassment and "second-hand harassment" in the hostile work environment context); *Smith*, 388 F.3d at 567 ("While certainly relevant to the determination of a hostile work environment claim, when harassment is directed at someone other than the plaintiff, the impact of such second-hand harassment is obviously not as great as the impact of harassment directed at the plaintiff." (internal quotations omitted)),[8] the more serious allegations of inappropriate physical contact may render Henneman's work environment hostile under Title VII.

"Physical harassment lies along a continuum just as verbal harassment does" and courts should "focus intently on the specific circumstances of physical harassment." *Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006). In this case, Henneman's two charges of physical contact by two different individuals appear to fall on separate sides of the continuum. First, with regard to O'Neil's brush-bys, Henneman's testimony indicates that this conduct was more awkward than sexually harassing—it lasted only as long as it took to pass by, it was never accompanied with sexual comments or other inappropriate

---

[8] All of the assertions regarding Cross and Bercerra involve conduct not directed at Henneman. Other incidents, such as Sellers asking Henneman if she had slept with Davis, and Henneman observing (and hearing about) other agents viewing pornography on AirTran's computers, appear isolated and have little impact on Henneman's work environment. *See Yuknis*, 481 F.3d at 555; *see also Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002); *Baskerville*, 50 F.3d at 430-31; *Saxton v. AT&T*, 10 F.3d 526, 533 (7th Cir. 1993) ("Thus, 'relatively isolated' instances of non-severe misconduct will not support a hostile environment claim. (quoting *Weiss v. Coca-Cola Bottling Co. of Chi.*, 990 F.2d 333, 337 (7th Cir. 1993)). Finally, Henneman's alleged complaint to Sellers about Cross and her conversation with Cross add nothing to this aspect of her claim inasmuch as they cannot be considered unwelcome harassment based on Henneman's sex. *See Morgan*, 536 F.3d at 115.

conduct, and Henneman never thought to report it.[9]  Even assuming sexual overtones, such behavior appears insufficient under Seventh Circuit precedent.  *See, e.g., McPherson v. City of Waukegan*, 379 F.3d 430, 434, 439 (7th Cir. 2004) (concluding that allegation that supervisor pulled back the plaintiff's shirt to see her bra was insufficient); *Hilt-Dyson,* 282 F.3d at 459, 463-64 (finding that incidents of supervisor rubbing plaintiff's back were "brief and involved no threats, intimidation or humiliation" and under the circumstances "did not constitute actionable sexual harassment under Title VII"); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998) (finding "four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks" insufficient under Title VII).

On the other side of the continuum, however, is Henneman's allegation of sexual assault on April 20, 2003.  This contention, which must be taken as true, may qualify as sufficiently severe to establish a hostile environment.  *See e.g., Patton*, 455 F.3d at 817 (finding allegation that harasser ran "his hand all the way up [the plaintiff's] inner thigh, under her shorts until he touched her underwear" actionable under the circumstances); *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001) (finding allegation that a supervisor touched the plaintiff's "breast near the nipple for several seconds" was sufficient to constitute a hostile work environment); *see also Lapka v. Chertoff*, 517 F.3d 974, 983-84 (7th Cir. 2008) (concluding that isolated incident of sexual assault sufficiently severe to establish hostile work environment); *Hostetler*, 218 F.3d at 808 (noting that "even one act of harassment will suffice if it is egregious"); *Erickson v. Wis. Dep't of Corrections*,

---

[9] Henneman went on to discuss the brush-bys, stating "I don't remember which one of us brought it up first.  I remember the first time it happened to me I kind of made a comment like 'Geez, Thomas,' and he laughed about it and said 'Ooh, I'm sorry,' just kind of brushing it off.  And I left it at that. I didn't really give it a second thought.  But it kept occurring. . . . I don't' recall how long it went on before one of us brought it to the others' attention.  I don't recall how we even began to speak about it."  (Pl.'s Ex. 3 at 46-47.)

22

469 F.3d 600, 604 (7th Cir. 2006); *Smith v. Sheahan*, 189 F.3d 529, 533-34 (7th Cir. 1999) ("Although less severe acts of harassment must be frequent or part of a pervasive pattern of objectionable behavior in order to rise to an actionable level, 'extremely serious' acts of harassment do not.").  Further, inasmuch as Moore's threats against Henneman appear tied to the alleged assault by Lipsey, they may qualify as sexual harassment.  The other incidents—pre- and post-October 13, 2003—of alleged sexual harassment therefore provide context (though limited in certain respects), and considering the totality of the circumstances, Henneman has put forward sufficient evidence to create question of material fact on this point.

## 2.  Employer Liability

The fourth element of the prima facie case requires that a basis for employer liability exist, regardless of whether the workplace may be considered hostile.  While the court is not to focus on the identity of the harasser in determining whether sexual harassment is sufficiently severe or pervasive, see *Mason*, 233 F.3d at 1045, "[t]he standard for employer liability turns on whether the alleged harasser was the plaintiff's supervisor, instead of a mere co-worker," *Rhodes*, 359 F.3d at 505, *see also Williams v. General Motors Corp.*, 187 F.3d 553, 559, 562 (6th Cir. 1999) ("District courts are required to separate conduct by a supervisor from conduct by co-workers in order to apply the appropriate standards for employer liability."); *Parkins*, 163 F.3d at 1032 (distinguishing co-worker and supervisor liability standards).  "Harassment by a supervisor of the plaintiff triggers strict liability, subject to the possibility of an affirmative defense in the event the plaintiff suffered no tangible employment action." *Rhodes*, 359 F.3d at 505.  On the other hand, "an employer may be found liable for a hostile work environment created by an

23

employee who was not the plaintiff's supervisor only where the plaintiff proves that the employer has been negligent either in discovering or remedying the harassment." *Id*. at 505-06.

As noted, Henneman charges harassment by fellow customer service agents (including Lipsey and Moore) and station supervisors (O'Neil and Cross). As to the former group, AirTran may be liable only if it was negligent in discovering or remedying the harassment. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 848 (7th Cir. 2008); *Rhodes*, 359 F.3d at 506. "Before liability for sexual harassment can arise, the employee must give 'the employer enough information to make a reasonable employer think that there was some probability that she was being sexually harassed.'" *Erickson,* 469 F.3d at 606 (quoting *Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir. 1996)); *see also Durkin v. City of Chicago*, 341 F.3d 606, 612 (7th Cir. 2003) (same). An employer may avoid liability if it has taken "appropriate corrective action reasonably likely to prevent the misconduct from recurring." *Lapka*, 517 F.3d at 984. In other words, "[a]n employer's response to alleged instances of employee harassment must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made." *McKenzie v. Illinois Dep't of Transp*., 92 F.3d 473, 480-81 (7th Cir. 1996) (internal quotation omitted). "The emphasis is on the prevention of future harassment." *Lapka*, 517 F.3d at 984.

At all relevant times, AirTran had an anti-harassment policy in place, and Henneman received training regarding sexual and other harassment. Henneman does not appear to assert that AirTran was negligent in discovering harassment by her coworkers. Instead, she submits that AirTran did not respond properly to her complaints regarding (1)

24

male employees viewing pornography on computers and Moore's use of her internet account in October or December 2002; (2) Lipsey's alleged sexual assault in April 2003; and (3) Moore's alleged threatening comments in July 2003.  (*See* Pl.'s Br. 51-54.)

First, Henneman contends that AirTran failed to take appropriate action in response to her complaint in October or December 2002 that male coworkers were viewing pornography and that Moore had linked her online account to a sex-chat website. However, Henneman's testimony undercuts this conclusory charge and demonstrates that AirTran acted reasonably in ending the perceived harassment.  For instance, when Henneman reported to Sellers that she believed Moore was using her internet account, Sellers called Moore into her office and asked Moore and Henneman to "work it out."  (Pl.'s Ex. 3 at 131)  Henneman then told Moore to clear her account within twenty-four hours, which he did.  (*Id.* at 135-136.)  Soon after, a member of AirTran's information technology staff reviewed the system, met with Henneman, and confirmed that firewalls were in place to prevent employees from accessing prohibited sites.  (*Id.* at 137-38.)  Henneman was advised to contact the IT staff member if any other problems arise.  (*Id.* at 138).  Henneman had no further problems or issues concerning the Internet at work.  (*Id.* at 129, 138.)

Next, Henneman charges that AirTran failed to respond adequately to her complaint regarding the April 20, 2003, sexual assault by Lipsey.[10]  She states that "Sellers decided Ms. Henneman's complaint was neither sufficiently important to address at the time nor within the three days that followed."  (Pl.'s Br. 51.)  And, after she submitted a

_____

[10] In a footnote, Henneman alleges that "The Defendant's workplace was permeated with sexual harassment and its failure to cure other complaints of sexual harassment placed it on notice that such misconduct was occurring."  (Pl.'s Br. 52 n.131.)  However, Henneman does not attempt to explain how this fits into her argument regarding AirTran's liability.

25

written complaint to Sellers on April 23, 2003, which was relayed to Amy Morris, AirTran's investigation into the complaint, according to Henneman, "was astonishingly inadequate." (*Id.* at 52.) She contends that Morris waited for more than a month to conclude the investigation, and that Sellers and Morris "failed to interview all relevant witnesses." (*Id.*) Specifically, she notes that no one interviewed Adam Garringer even though Henneman reported that Garringer was present at the time of the incident. (*Id.* at 52-53.) Further, she faults Sellers for not "unilaterally terminat[ing] Lipsey or disciplin[ing] him in any fashion," despite Sellers's knowledge of previous complaints about Lipsey from other coworkers.

Again, despite Henneman's contention, AirTran's actions constituted a reasonable response to her complaint under the circumstances.[11] First, Henneman's assertion that Sellers deemed her complaint not "sufficiently important to address at the time" misrepresents the record. According to her testimony, she raised the matter with Cross on April 21, 2003, and he impolitely told her to bring it up with Fox. When Fox arrived, Henneman told him that something happened (she did not want to go into details) and that she wanted to talk to Sellers. (Pl.'s Ex. 3 at 149.) However, Sellers was out of town, and Henneman was unable to bring the matter to Sellers until April 23, 2003. (*Id.* at 150, 155.) When Henneman met with Sellers, Sellers had her fill out a complaint form and the complaint was thereafter relayed to Amy Morris, who initiated an internal investigation. (*See* Pl.'s Ex. 7 at 121-23.)

---

[11] Henneman affirmatively asserts that "[i]mmediately, Sellers separated Ms. Henneman from Lipsey by assigning Ms. Henneman to work in the Defendant's bag room." (Pl.'s Br. 52.) However, physical separation may be evidence of reasonable remedial action. *See Lapka,* 517 F.3d at 985 ("We have noted that taking effective steps to physically separate employees and limit contact between them can make it 'distinctly improbable' that there will be further harassment.").

26

Moreover, Henneman's critique of the investigation and anger that Lipsey was not more severely sanctioned are not grounds for discounting AirTran's response. "[T]he emphasis of Title VII in this context is not on redress but on the prevention of future harm." *Lapka*, 517 F.3d at 984; *Saxton*, 10 F.3d at 535 ("Although AT&T's remedial efforts did not meet Saxton's expectations, they were both timely and reasonably likely to prevent the conduct underlying her complaint from recurring."). While it is unclear why Morris did not obtain a statement from Garringer, she did obtain and review written statements from Henneman, Lipsey, and Moore. (SPFOF ¶¶ 189-90; Pl.'s Ex. 7 at 123-24.) Henneman's statement conflicted significantly with those submitted by Lipsey and Moore, (*see* Def.'s Exs. 145, 146), and Morris concluded that under the circumstances she could not substantiate Henneman's allegations, (Def.'s Ex. 148). Thereafter, Morris sent a letter to Lipsey stating, among other things, it had investigated Henneman's complaint and "further allegations of sexual harassment against him would not be tolerated." (SPFOF ¶ 191.) The letter explained that Lipsey "is to maintain only a professional demeanor when interacting with Ms. Henneman." (Def.'s Ex. 148.) A copy of AirTran's sexual harassment policy was provided with the letter, and Sellers reviewed the letter with Lipsey. (Def.'s Ex. 148, Pl.'s Ex. 7 at 127.) Such actions are sufficient for Title VII purposes, and it is not suggested that Lipsey engaged in any subsequent misconduct.

Henneman goes on to assert that AirTran failed to take appropriate action in response to her complaints about Moore's conduct. First she takes issue that "sometime before June 2003" Sellers brushed off her complaint that Moore was making inappropriate comments, stating only that "boys will be boys."[12]

---

[12] Henneman's argument on this point is limited to one sentence. (Pl.'s Br. 53.)

27

Management's refusal to act after receiving repeated complaints of sexual harassment "is a straight road to liability under Title VII." *Isaacs*, 485 F.3d at 386. But the standard to be applied is employer negligence in remedying complaints of sexual harassment under the circumstances, and it is not apparent from the record that Henneman presented to Sellers "enough information to make a reasonable employer think that there was some probability that she was being sexually harassed" at that time. *See Erickson*, 469 F.3d at 606. Henneman's testimony indicates only that she informed Sellers about Moore's general comments to others about his sex life, (Pl.'s Ex. 62-63), which, while certainly inappropriate for the workplace, were never directed at Henneman. Further, Moore's comments were not physically threatening or such that they interfered with Henneman's work performance.

In light of Henneman's familiarity with AirTran's anti-retaliation policy, AirTran cannot be liable on this point given the circumstances.[13] After Sellers commented "boys will be boys," Henneman dropped the matter. *Cf. Isaacs*, 485 F.3d at 386 ("As Isaacs related events, she complained repeatedly to supervisors and management-level personnel at Hill's Pet Nutrition about how the men were treating her, and she received the same response every time: one or another variation on 'grin and bear it.' The employer's approach thus remained constant.").

---

[13] It is not clear when Henneman complained to Sellers about Moore's general comments. She indicates only that it happened before she injured her head in June 2003. (Pl.'s Ex. 3 at 62-63; SPFOF ¶ 170.) If she complained about Moore's general comments before the April 2003 incident with Lipsey (which appears likely given the activities that followed her formal complaint of that incident), there is no basis for employer liability inasmuch as the record, at that time, does not show that Henneman was subject to a severe or pervasive harassment based on her sex. If it occurred after, Henneman is unable to show employer negligence as her previous complaint to Sellers (which triggered an internal investigation) demonstrates her understanding of how to register a complaint of sexual harassment.

28

Henneman's specific complaints to AirTran about Moore's threats to her and her family in July 2003, however, would certainly trigger employer liability if not promptly considered. Here, Henneman offers that in response to her complaint about Moore's threats, "the defendant did not conduct an investigation . . . nor did it discipline Moore in any away as a result." (Pl.'s Br. 54.) While it appears that AirTran did not follow through on a formal internal investigation, this does not necessarily result in liability. Again, the standard is whether the employer's response is appropriate under the circumstances. Once Henneman raised her concerns to Fox, he reported her complaints to Sellers. (Pl.'s Ex. 7 at 108-09.) Henneman then met with Fox, Cross, and O'Neil to discuss Moore's threatening comments. After the meeting, Sellers met with Henneman, and Henneman, with Seller's encouragement, filed a complaint against Lipsey and Moore with the Milwaukee County Sheriff's Department. (SPFOF ¶ 167.) Sellers and O'Neil were interviewed by the sheriff's department, as were Jensen, Lipsey, Moore, and Ott. (Def.'s Ex. 113.) Ultimately, the sheriff's department investigation was closed on the ground that it revealed no evidence that a crime had been committed. (*Id*.)

Under these circumstances, it is not apparent how AirTran's actions following Henneman's complaint qualify as a negligent response to sexual harassment. As noted by AirTran, the sheriff's department was involved shortly after AirTran was made aware of Henneman's concerns, and AirTran cooperated in the investigation. Sellers kept Morris apprised of the situation as well as the investigation; the sheriff's department interviewed the relevant witnesses; and Morris testified that she wanted to wait on any internal investigation until after the police concluded their investigation. (Pl.'s Ex. 8 at 59.) Inasmuch as the sheriff's department investigation was closed due to lack of evidence, it

29

was reasonable for AirTran to refrain from further internal investigation and punishment. *See Lapka*, 517 F.3d at 984 ("The police report already contained detailed statements from Lapka and Garcia; the DHS knew that the police had decided not to prosecute due to a lack of evidence. . . . It was reasonable for the DHS to believe that it, too, had insufficient evidence to proceed against Garcia.").  As noted, "the question is not whether the punishment was proportionate to the offense but whether the employer responded with appropriate remedial action reasonably likely under the circumstances to prevent the conduct from recurring." *Id.* at 984-85 (quoting *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044,1049 (7th Cir. 2000)).  Henneman does not allege that Moore engaged in any further harassment (or even that she had to work near him again), and the record indicates that Moore was terminated by AirTran for insubordination within a month of the investigation.

Henneman also contends that AirTran failed to respond adequately to harassment by station supervisors Cross and O'Neil.  At the outset, AirTran contends that O'Neil is not a supervisor of Title VII purposes.  "'Supervisor' is a legal term of art for Title VII purposes." *Rhodes*, 359 F.3d at 506.  "An individual is not a supervisor unless he possesses the authority to directly affect the terms and conditions of a victim's employment." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002).  "[A]n employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context." *Rhodes*, 359 F.3d at 506.  Where an individual does not have the authority to "hire, fire, demote, promote, transfer, or discipline" the plaintiff, courts have been reluctant to define that individual as a "supervisor" under Title VII.  *See e.g., Hall*, 276 F.3d at 355 (finding that harasser was not a "supervisor"

30

despite authority to direct plaintiff's work operations, provide input on evaluations, and train new employees).

Henneman does not address AirTran's argument on this point. Instead, she notes that "[t]he *Ellerth* defense is available to the Defendant" and proceeds to discount this defense against her allegations of harassment. (Pl.'s Br. at 51.)

The affirmative defense discussed in *Burlington Industries Inc. v. Ellerth*, 524 U.S. 742 (1998) and related cases applies when no tangible employment action results from alleged supervisor harassment. Accordingly, an employer may avoid liability by showing "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. 742 (1998); *Mason*, 233 F.3d at 1043 n.4.

Inasmuch as AirTran's station supervisors lack the authority to hire, fire, demote, promote, transfer, or discipline, they do not appear to qualify as "supervisors" for Title VII purposes. In this regard, Henneman agrees that all final decisions regarding hiring, promotions, transfers, layoffs, recalls, discipline, scheduling, and discharge of customer service agents are made by the station manager in Milwaukee or a human resources officer at AirTran's corporate headquarters. (*See* DPFOF ¶ 28-41.) While station supervisors have the authority to assign personnel to various tasks and may issue Employee Discipline Reports and Attendance Review Forms reflecting absences or tardiness, this does not appear to be sufficient "power to directly affect the terms and conditions of the plaintiff's employment," especially given the authority reserved to the station manager. *See e.g. Andonissamy,* 547 F.3d at 848 (finding that alleged harasser

31

was not a supervisor for Title VII purposes even though he carried the title of "supervisor," directed the plaintiff's work activities, and recommended disciplinary action to human resources); *Rhodes*, 359 F.3d at 506 (finding that harassers were not "supervisors" even though they "managed Rhodes' work assignments, investigated complaints and disputes, and made recommendations concerning sanctions for rule violations" to the employer); *Parkins v. Civil Constrs. of Illinois, Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998) (finding that union foremen and crew chiefs were not "supervisors").

In any event, AirTran's potential liability with regard to O'Neil's conduct can be easily dismissed under any standard.  The only allegations of harassment against O'Neil concern the occasional brush-by when Henneman was working the ticket counter, and Henneman concedes that she never complained about O'Neil.  *See Ellerth*, 524 U.S. 742; *see also Roby v. CWI, Inc.*, 579 F.3d 779, 786 (7th Cir. 2009 ) (concluding that defendant's affirmative defense applies given the plaintiff's failure to report the harassing conduct); *Rhodes*, 359 F.3d at 507 (noting that "'the law against sexual harassment is not self-enforcing'" (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1014 (7th Cir. 1997)). Lastly, Henneman's conclusory assertion that AirTran should have known about O'Neil's allegedly harassing conduct is without support.

As for Cross, Henneman maintains that AirTran failed to respond adequately to her October 2003 complaint to Sellers that she believed Cain may quit because of Cross's behavior.  During this conversation, Henneman told Sellers that Cross had made a sexual hand gesture several months earlier, which she found offensive.  (*See* PPFOF ¶ 560; Pl.'s Ex. 3 at 85-86, 98-99.)

32

In response, AirTran contends that there can be no basis for employer liability on this point because Cross's conduct, assuming all allegations discussed above to be true, was not sufficiently severe or pervasive to create an objectively hostile environment.

Henneman contends that she was complaining about Cross's conduct during her October 2003 conversation with Sellers. Also, none of Cross's allegedly inappropriate behavior was directed at Henneman or physically threatening. *See Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1145 (7th Cir. 1997) ("We think it important to take into account what Novak did not do. As far as the record reveals, Novak: 'never touched the plaintiff. He did not invite her, explicitly or by implication, to have sex with him. He made no threats. He did not expose himself, or show her dirty pictures. He never said anything to her that could not be repeated on prime-time television.'" (quoting *Baskerville*, 50 F.3d at 431). Further, while Cross is alleged to have referred repeatedly to one of the female agents as "the AirTran whore"—an offensive and degrading label—the remaining instances of inappropriate behavior appear to be isolated incidents occurring over a nearly eighteen-month span. *See Kampmier*, 472 F.3d at 941; *Saxton*, 10 F.3d at 533, 537 ("[R]elatively isolated instances of non-severe misconduct will not support a hostile environment claim"). As an employer cannot be held liable for conduct that is not actionable, Henneman cannot recover for AirTran's alleged failure to respond adequately to her October 2003 complaint about Cross. *See e.g., Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009); *Adusumilli*, 164 F.3d at 361-62 (noting that for sexual harassment to be actionable it must be sufficiently severe or pervasive).[14]

---

[14] Of note, Henneman's argument that she complained to Sellers about "Cross' sexually depraved conduct" is not apparent from the record. Henneman's testimony indicates that she informed Sellers that she believed that Cain may quit because of the way Cross was treating her. (Pl.'s Ex. 3

33

## B. Retaliation

Henneman also maintains that AirTran retaliated against her for complaining about sexual harassment. "Title VII forbids an employer from discriminating against an employee who has 'opposed any practice' made unlawful by Title VII." *Scruggs*, 587 F.3d at 838. "A plaintiff can prove a retaliation claim under either the direct method of proof or the indirect method." *Roby*, 579 F.3d at 786-87 (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662-63 (7th Cir. 2006)).

"Under the direct method, a plaintiff must present evidence that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists between them." *Scruggs*, 587 F.3d at 838. Alternatively, "a plaintiff proceeding under the indirect method establishes a prima facie case by establishing the same first two elements, as well as that: (3) she was meeting her employer's legitimate expectations; and (4) she was treated less favorably than a similarly

---

94-95.) Henneman did not know the details of why Cain was going to quit, but she told Cain that she would talk to Sellers. (*Id.* at 96-97.) Henneman did not provide any details to Sellers about why Cain may quit, just that she believed employees were quitting because of Cross and that Cross "needed to be stopped." (*Id.* at 99.) Sellers then asked Henneman to discuss the matter with Cross. (*Id.*) Thereafter, Henneman spoke to Cross and stated that she knew he wanted to be a pilot and that because of his inappropriate behavior some of the female employees may file suit. She said it would be a shame if he were to ruin his plan of becoming a pilot due to his behavior and comments. (*Id.* at 100-01.) The next day, Henneman informed Sellers that she had talked to Cross. (*Id.* at 102.) Henneman goes on to argue that Sellers' request Henneman talk to Cross was not "reasonably calculated to discover and rectify Cross's harassing conduct, as required in order to benefit from the *Ellerth* affirmative defense," (Pl.'s Br. at 55), but it is not apparent that (1) Henneman's October 2003 "complaint" was sufficient to alert AirTran that *she* was being sexually harassed by Cross, or (2) Henneman reasonably attempted to take advantage of AirTran's preventive or corrective opportunities to avoid harm. *See Ellerth*, 524 U.S. at 765; *see also Jackson v. County of Racine*, 474 F.3d 493, 502 (7th Cir. 2007) ("One sign of unreasonable behavior on the plaintiffs' part is undue delay in calling the problem to the employer's attention."); *Roby*, 579 F.3d at 86. It is undisputed that AirTran had a comprehensive anti-harassment policy in place that set forth several steps for registering a complaint, including stating the problem to the manager either verbally or in writing, and if unable to resolve the problem by talking to the manager, contacting the Human Resources department. (Def.'s Ex. 1.) Henneman knew how to register a complaint of sexual harassment pursuant to the policy—she had trained on the matter and had filed previous complaints earlier in 2003. *See generally Cerros v. Steel Tech., Inc.*, 398 F.3d 944, 952 (7th Cir. 2005) (discussing the *Ellerth* affirmative defense and noting that the employee need not follow the letter of the employer's policy so long as the employee "adequately alerted her employer to the harassment, thereby satisfying her obligation to avoid the harm").

34

situated employee who did not engage in statutorily protected activity." *Id.* (citing *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) and *Kodl v. Bd. of Educ., Sch. Dist. 45, Villa Park,* 490 F.3d 558, 562 (7th Cir. 2007)).

"If the plaintiff succeeds in passing this initial hurdle, the burden shifts to the defendant to demonstrate a nondiscriminatory reason for its action. *Id.* (citing *Stephens*, 569 F.3d at 787). "If the defendant does so, the plaintiff must show that a genuine issue of material fact exists as to whether the defendant's proffered reason was pretextual to avoid the entry of summary judgment against it. *Id.* (citing *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). "'An employee's failure to cast doubt on an employer's nonretaliatory explanation' means a claim fails under either the direct or indirect method." *Id.* (quoting *Argyropoulos*, 539 F.3d at 736 n.6).

For retaliation, an adverse employment action "must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Roney v. Illinois Dep't of Transp.,* 474 F.3d 455, 461 (7th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). And, pursuant to 42 U.S.C. § 2000e-5(e)(1), a charge of employment discrimination must be filed with the EEOC within 300 days of the alleged unlawful employment practice. Because Henneman's filed her first administrative charge with the ERD and EEOC on August 10, 2004, any discrete acts that occurred more than 300 days prior to this date, or before October 13, 2003, cannot be the basis of her Title VII retaliation claims. *See Roney*, 474 F.3d at 459-60.

35

Acknowledging these limitations,[15] Henneman submits that after she complained of harassment in April 2003 and October 2003, AirTran engaged in three acts of retaliation after October 13, 2003: (1) she received Employee Discipline Reports (EDRs); (2) other employees ostracized her at the direction of AirTran; and (3) AirTran denied her requests for light duty assignments following her January 2004 injury. These allegations are addressed in turn.

First Henneman asserts that after she complained in April 2003 about Lipsey's conduct, she received eleven EDRs for tardiness and absences. She claims that before May 2003, she had not received any EDRs even though she had on occasion been absent or tardy.

However, as Henneman acknowledges, only two of the EDRs were issued within the limitations period, and she makes no argument that she was unaware of what she believes to be retaliatory activity until after October 13, 2003. To the contrary, Henneman maintains that this form of retaliation began shortly after her April 2003 complaint. Hence, the claim of retaliation is untimely. *See Roney,* 474 F.3d at 460 ("[T]he record indicated Roney knew about the retaliatory act of which he now complains shortly after it occurred . . . however, Roney waited over 300 days to file a charge with the EEOC.")

In any event, Henneman is unable to show that the issuance of EDRs under the circumstances qualifies as an adverse employment action. *See Longstreet v. Ill. Dep't of Corrections*, 276 F.3d 379, 384 (7th Cir. 2002) (noting that the plaintiff's complaints "of

_____

[15] Henneman includes in her brief several incidents of retaliation that occurred outside the limitations period. She provides these allegations as "background evidence." The court has reviewed these allegations and includes relevant matters in its discussion.

36

negative performance evaluations and being required to substantiate that her absences from work were illness-related . . . are not adverse employment actions actionable under Title VII").  Henneman concedes that she was never suspended, docked any pay, or suspended from shift trades due to attendance issues.  Further, simply stating that she was not issued discipline reports until she started complaining is not sufficient to establish a causal connection, see *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 859 (7th Cir. 2008) (noting that "suspicious timing alone is generally insufficient to establish a genuine issue of material fact for trial"), and here the only two actionable EDRs were issued several months after Henneman first complained of harassment.  Finally, Henneman is unable to show pretext inasmuch as she concedes that the EDRs (before and after October 13, 2003) accurately reflect that she was absent or tardy on the date issued.  *See Scruggs*, 587 F.3d at 838-39 (noting that pretext refers to a "'lie, specifically a phony reason for some action.'" (quoting *Argyropoulos*, 539 F.3d at 736)).

Next, Henneman asserts that AirTran retaliated against her because she was ostracized by her coworkers following her April 2003 complaint.  Further, she alleges that on July 30, 2003, Sellers' instructed employees that they should not be alone with Henneman because Henneman may find something to complain about.

Again, not only does this claim of retaliation appear untimely, see *Roney*, 546 F.3d at 859, it is insufficient to show an adverse employment action under the circumstances.  Henneman testified that starting in late April 2003, some of her coworkers talked to her less than before.  According to Henneman, "they would talk to me if it was a work-related issue.  But there was no small talk or chatting."  (Pl.'s Ex. 3 at 260.)  Later, she later clarified that certain coworkers continued to talk to her about social matters.  (*Id.*

37

at 260-61.) Henneman never asked any of her coworkers what changed, but she believed it was because she complained of harassment. (*Id.* at 261; SPFOF ¶ 166.) This is not enough.

"An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N.*, 548 U.S. at 68 (citing 1 B. Lindemann & P. Grossman, *Employment Discrimination Law* 669 (3d. 1996). As for Sellers' alleged "directive to employees to avoid being alone with Ms. Henneman," AirTran is correct that there is no admissible evidence supporting this contention. Henneman points to an email from Sellers to Morris dated July 30, 2003, in which Sellers states that during the monthly station meeting that day, several agents complained that two employees (Henneman and Dalton) were creating a negative work environment. (PPFOF ¶ 677.) Henneman then assumes that Sellers must have told the employees at the meeting to stay away from Henneman because Ott testified that she overheard another employee say that Sellers made such a comment. (Pl.'s Br. 59 & n.160; PPFOF ¶¶ 669-70; Pl.'s Ex. 4 at 340-41.) But Ott's testimony about what another agent may have heard Sellers say is inadmissible hearsay to the extent it is offered for the truth of the matter asserted. *See* Fed. R. Evid. 802; Fed. R. Civ. P. 56(e); *see generally Gunville v. Walker*, 583 F.3d 979 (7th Cir. 2009). Indeed, Ott testified that she never heard Sellers say anything regarding whether employees should avoid Henneman. (Pl.'s Ex. 4 at 434-44.)

Finally, Henneman asserts that AirTran's "outright refusal to offer Ms. Henneman a light duty work assignment was an adverse employment action because it ended her career." (Pl.'s Br. 57.) For this proposition, she attempts to tie her discussion

38

with Sellers in October 2003 about Cross's behavior to AirTran's refusal to grant her request for modified duties following her shoulder injury in January 2004. On this point of her claim, she proceeds under the indirect and direct methods of proof.

As for the indirect method, several concerns arise. Importantly, Henneman is unable to establish that she was treated less favorably than similarly situated employees who did not complain. As a general matter, a court must look at all relevant factors in determining whether two employees are similarly situated, and the number of factors depends on the context of the case. *See Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617-18 (7th Cir. 2000); *see also Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006) ("The inquiry is fact intensive, requiring consideration of the circumstances as a whole."). "[M]embers of the comparison group must be comparable to the plaintiff in all material respects." *Crawford v. Indiana Harbor Belt R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006); *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1155 (7th Cir. 1997). This includes establishing that a similarly situated employee was treated more favorably at the time of the alleged discrimination. *See Jordan v. City of Gary*, 396 F.3d 825, 834 (7th Cir. 2005).

Henneman points to customer service agent Louann Kojis, who she asserts was permitted light duty for seven months following a work-related injury. However, the record does not support this assertion. Kojis was injured and out of work from March 29, 2003, to June 14, 2003. (PPFOF ¶ 69.) She returned with medical restrictions, and was released to work without restrictions on August 19, 2003. Further, Kojis's prolonged assignment to the ticket counter during the summer of 2003 appears to have resulted from her successful bid on one of several part-time ticket-counter-only positions that opened in

39

June 2003 and ended in October 2003.  (DPFOF ¶¶ 57-59; Pl.'s Response to DPFOF ¶¶ 57-59.)

Henneman's medical restrictions following her shoulder injury in January 2004 limited her ability to lift and use her arm significantly.  These restrictions, put in place in April 2004, were made permanent by Henneman's physician in December 2004. (SPFOF ¶ 176-77; Def.'s Ex. 110.)  As "light duty" appears to be an amorphous concept that simply refers to assignments with reduced physical labor, the provision of light duty at any given time depends on the ability of the injured agent to function as a member of the work crew and the needs and demands of the business.  While Henneman asserts that she requested light duty at various points between June 2004 and December 2004, she puts forward no evidence that any comparator suffered similarly severe restrictions while being permitted to work indefinite light duty as a customer service agent.

Moreover, under the direct or indirect method, the evidence in the record does not create an issue for trial as to whether AirTran's reason for denying the request for light duty was a pretext for retaliation.  "Pretext is a 'lie, specifically a phony reason for some action.'"  *Hobbs v. City of Chicago,* 573 F.3d 454, 461 (7th Cir. 2009) (quoting *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006).  "[A] plaintiff demonstrates pretext by showing the employer's proffered nondiscriminatory reason is a lie and the real reason is based on discriminatory intent."  *Id.*  AirTran maintains that Henneman's medical restrictions rendered her unable to perform the duties of a customer service agent and that it could not accommodate her request for indefinite light duty.  This is a legitimate reason inasmuch as the job description for a customer service agent includes the ability to bend, kneel, crawl, and lift items up to seventy pounds.  It is

40

undisputed that Henneman was unable to meet this standard. And, while AirTran's policy was to work with agents who suffered on-the-job injuries and assess whether modified duty may be available, light duty was never guaranteed. Henneman's belief that she could perform a few of the duties of a customer service agent (such as working the ticket counter or the gate) does not cast doubt on AirTran's decision that an indefinite, modified work assignment was not advisable or available at the time Henneman made her request. Further, Henneman's meeting in January 2005 with Amy Morris and Cheryl Beasley regarding her ability to perform the duties of a customer service agent given her now-permanent medical restrictions appears to support AirTran's position. (Def.'s Ex. 111.) Now, therefore,

IT IS ORDERED that the defendant's motion for summary judgment on all claims (Doc. # 19) is granted.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 31st day of March, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

41